# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

MICHAEL STEWART CARTER,

         Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

         Defendant.

No. C11-4071-LTS

**MEMORANDUM OPINION AND
ORDER**

---

### *Introduction*

The plaintiff, Michael Carter, seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 405(g), 1383(c)(3). Carter contends the administrative record ("AR") does not contain substantial evidence to support the Commissioner's decision that he is not disabled.

### *Background*

Carter was born in 1964, has a GED, and previously worked as a cable installer, warehouse worker, cook helper, cleaner, furniture mover and stocker. AR 452. On February 5, 2008, he applied for DIB and SSI, alleging disability beginning on April 28, 2004, due to constant low back pain and right leg and hip pain. AR 187-95, 435. The Commissioner denied Carter's applications initially and again on reconsideration. AR 73-76, 80-93. Carter requested a hearing before an Administrative Law Judge ("ALJ"). AR 94. The hearing was held on March 11, 2010, before ALJ G. Roderic Anderson. AR 27-54. Carter testified along with his girlfriend, Wanda Abraham, and a vocational expert ("VE"). *Id.* On July 16, 2010, the ALJ issued a decision finding Carter not disabled since the alleged disability onset date of April 28, 2004. AR 9-19. Carter sought review of this decision by the Appeals Council, which denied review on

July 5, 2011.  AR 1-3.  Thus, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1481.

On August 31, 2011, Carter filed a complaint in this court seeking review of the ALJ's decision.  On October 6, 2011, with the parties' consent, United States District Judge Mark W. Bennett transferred the case to Chief United States Magistrate Judge Paul A. Zoss for final disposition and entry of judgment.  On June 8, 2012, the case was reassigned to the undersigned.  The parties have briefed the issues, and the matter is now fully submitted.

## Summary of Evidence

### A. Medical History

Carter states he injured his lower back on April 28, 2004, while lifting a 180-pound boulder in the course of his work duties.  AR 492.  In May 2004, Carter saw Dr. Charles Buck at Mercy Hospital in Iowa City, Iowa, for his back pain.  Dr. Buck ordered an x-ray of Carter's spine.  The x-ray revealed that there was a mild convexity of the mid-lumbar spine directed toward the patient's left side.  Otherwise, his alignment and disc spaces were well maintained and no congenital aberrations were found.  AR 474.

On July 30, 2004, Carter saw Dr. Dale Bertram at Concentra Medical Center in Madison, Wisconsin, where he was currently residing.  Carter mentioned the April 28, 2004, incident and told the doctor about a previous work-related back injury he suffered five years earlier.  He complained of back pain that was radiating down both thighs.  AR 492.  Dr. Bertram performed a physical exam during which he found "[m]oderate diffuse and nonspecific 'soreness' as well as increased muscle tone/tension...bilaterally in the L1 to S1 lumbar area."  *Id.*  Dr. Bertram diagnosed Carter with lumbar strain and prescribed pain relievers and a muscle relaxant.  Dr. Bertram also referred Carter to physical therapy for evaluation, treatment, and possible

future therapy planning.  AR 493.  Carter was released to return to work that day with no work activity restrictions.  AR 493.

At a follow-up appointment with Dr. Bertram on August 4, 2004, Carter reported decreased pain and stated he was no longer experiencing radiating pain down each leg.  AR 502.  The physical exam revealed "[m]inimal diffuse and nonspecific 'soreness'" with all other extremities and signs appearing normal.  *Id.*  Carter stated his medication was providing adequate relief without any side effects.  Dr. Bertram released Carter that day with no work activity restrictions, and Carter again followed up with a physical therapist.  *Id.*

On August 10, 2004, Dr. Bertram declared Carter's lumbar strain resolved.  AR 509.  He was released from care with regular unrestricted work activity and no permanent partial disability.  AR 509.  Carter's physical therapy goals were also met and physical therapy was discontinued.  AR 505.

Carter did not see a doctor again until March 9, 2005, when he visited the Emergency Treatment Center of University of Iowa Hospitals and Clinics ("UIHC"). He was diagnosed with acute exacerbation of chronic back pain and prescribed pain relievers and a muscle relaxant.  AR 481.  He was given a doctor's note that excused him from work until March 12, 2005, with a change in work duties to "light duty—no lifting over 10 pounds until seen in ortho."  AR 480.  Appointments were scheduled for him on March 31, 2005, at the back clinic at UIHC.  AR 482-83.

Later that month, Carter saw Dr. Buck again through the Mercy Occupational Health Program.  Dr. Buck noted the following work restrictions: Carter could lift, push, and pull 10 to 20 pounds for a third of a regular work day; and he could bend and twist his back for a third of a regular work day.  AR 486.  Dr. Buck ordered an MRI, suggested Carter complete physical therapy twice a week for two weeks, and prescribed a muscle relaxant and Ibuprofen.  AR 477-79.

Carter next saw a doctor in June 2005 at Siouxland Community Health Center. Carter still complained of back pain at this appointment and said he re-injured it while

wrestling around and playing with his children.  AR 634.  He also mentioned that he had injured his back at work, but had chronic back pain since 1995 and was trying to get disability.  Carter was prescribed pain and anti-inflammatory medication.  AR 634.

Dr. Douglas Martin with St. Luke's Occupational Medical Clinic performed a Comprehensive Examination Report at the request of the Iowa Department of Disability Determination Services Bureau on July 6, 2005, regarding a previous disability application Carter had filed.   AR 461-64.   Dr. Martin assessed Carter with musculoskeletal low back pain.   With respect to Carter's remaining functional capacities, Dr. Martin stated,

> [I]t is unclear to this examiner whether this gentleman has had adequate evaluation and treatment for his low back problems in the past.  However, I can say that it would appear these are primarily muscular in nature. There is nothing on physical examination today to suggest any type of neurological involvement.

AR 463.

In July 2006, Dr. Martin performed another comprehensive examination and found very little change.  AR 518.  He estimated Carter would be able to lift and carry 35 to 40 pounds occasionally, 20 pounds frequently, and 5 to 10 pounds constantly. AR 518.  He also suggested that stooping, climbing, kneeling, and crawling activities should be reduced to about two-thirds of what would be considered normal.  AR 518. Otherwise he had no concerns with respect to Carter's ability to stand, move about, walk, or sit. *Id.*

Starting in December 2005, Carter sought emergency treatment various times for his back pain.  He first visited St. Luke's Regional Medical Center complaining that he had injured his back while shoveling snow.  AR 614.  He was prescribed pain and anti-inflammatory medication and instructed to follow-up at Siouxland Community Health Center within two days.  AR 613-18.  There is no evidence in the record that Carter sought a follow-up appointment.  In July 2006, Carter reported to the emergency room at Mercy Medical Center for lower back pain radiating down his right leg.  AR 536.

He was given an anti-inflammatory injection and prescribed anti-inflammatory medication. Noting that he did not have a primary care doctor, the physician advised Carter to follow-up at Siouxland Community Health Center within a week. AR 537. There is no evidence in the record that Carter sought a follow-up appointment. Carter again reported to the emergency department at St. Luke's Regional Medical Center in December 2006 with lower back pain. He was diagnosed with lumbar strain, and prescribed pain relievers and a muscle relaxant. AR 606.

Carter also alleged a mental impairment of depression in December 2006. AR 544. He was sent to Michael Baker, Ph.D. for a consultative examination. AR 541-43. Dr. Baker concluded that with regard to mental limitations related to work activities:

> Mr. Carter would seem to have sufficient ability to remember and understand instructions, procedures, and locations. There is no indication of impairment of ability to maintain attention, concentration and pace for carrying out instructions. He interacted appropriately during this session and gives no significant evidence of difficulty doing so. There is also a lack of indication of judgment being significantly affected by changes in the workplace.

AR 543.

In January 2007, Carter sought treatment at Siouxland Community Health Center. He described his back pain as 8.5 out of 10. The physician noted some tenderness of the lumbosacral midline area and over the right SI. The straight leg raise test was negative for radiculopathy but produced pain of the lower back. Carter was prescribed a pain reliever and instructed to follow-up in two months. AR 638-39. Carter followed up at Siouxland Community Health Center once a month for the next four months. AR 635-37.

In February 2007, Carter reported having occasional low back pain with radiation to either leg but nothing consistent. He said he had discomfort if he was lifting certain things like an aquarium. AR 637. In April 2007, Carter was told he

would not be able to take any more acetaminophen-hydrocodone as he had previously been prescribed.  The doctor suggested a combination of Ibuprofen and Tylenol along with back exercises and application of heat and ice.  AR 635.  Carter was instructed to schedule a follow-up appointment two to three months later.

On April 30, 2007, Carter reported to the emergency room at Mercy Medical Center claiming his back pain worsened after running to catch the bus the day before. AR 591.  The physician noted he appeared to be in mild discomfort but could get around fairly easily.  *Id.*  She noted that he had muscle spasms on the right paraspinal muscle.  AR 592.  He was prescribed pain relievers and a muscle relaxant and instructed to follow-up with his physician at Siouxland Community Health Center.  AR 592.

In May 2007, Carter began seeing orthopaedic specialist Dr. Robert Yang at UIHC, who suggested an MRI to evaluate further treatment options.  AR 661-64.  The MRI revealed signs of degenerative disc disease but no evidence of a neural element compression.  AR 659.  Dr. Yang told Carter he was not a good surgical candidate and suggested they try an epidural steroid injection.  *Id.*  Carter was given the epidural steroid injection for his back pain in August 2007.  His pain was completely relieved by this procedure, but only for a short time.  AR 655.  Dr. Yang then recommended electromyography ("EMG") testing.  AR 656.  An EMG in October 2007 showed no evidence of lumbosacral radiculopathy, which suggested the MRI scans were of "uncertain clinical importance."  AR 653.  Dr. Yang next recommended sacroiliac joint injections.  AR 653.

In December 2007, Carter sought emergency treatment for lower back pain radiating down his right leg at St. Luke's Regional Medical Center.  He was given morphine and prescribed a pain reliever.  AR 603-04.

In January 2008, Carter returned to Dr. Yang for sacroiliac joint injections.  AR 651-52.  He was advised of post-injection activity limitations and instructed to follow up by telephone one to two weeks later.  AR 651.

A week later, Carter was traveling to Chicago and reported to an emergency room along the way in Onawa, Iowa, describing his back pain as nine out of ten. AR 643-46.   Carter stated his discomfort had started a week ago and was getting progressively worse in his right low back area and radiating down his right leg.   He was prescribed a muscle relaxant and pain relievers and advised to rest and apply a combination of ice and heat to his back.   *Id.*

In May 2008, Carter returned to visit Dr. Yang.  AR 703.  He had another MRI, and Dr. Yang noted that Carter's pain seemed to be more in his hip joint.  Carter had an x-ray taken of his hip, which revealed coxa profunda[1] with moderate degenerative changes of the hip.  AR 712.   In June, he was treated with an injection and was able to walk without the cane he had recently started using.   *Id.*   The injection completely relieved his pain for approximately three weeks.  AR 705, 745.

In August 2008, Carter was referred to another specialist in the orthopaedics unit of UIHC, Dr. Chris J. Van Hofwegen.  During this visit, Carter reported that he used a cane for long walks over the past four weeks and otherwise used it occasionally.  AR 745.  The notes indicate Carter could walk 30 to 60 minutes without support.  AR 745.  Dr. Van Hofwegen concluded Carter had mild hip arthritis with symptoms that seemed to be worse than the radiographs revealed.  AR 748.  He prescribed anti-inflammatory medication and suggested "being aggressive about being active."  *Id.*  Carter was then scheduled for a follow-up four months later.

In January 2009, Carter sought emergency treatment at St. Luke's Regional Medical Center for his hip pain where he was diagnosed with hip strain and prescribed anti-inflammatory medication and a muscle relaxant.  AR 718-30.  In February 2009, he went to the emergency room at Mercy Medical Center for hip pain.  AR 733-44.  A hip x-ray showed "questionable small spurs" but no issues with the acetabulum or

---

[1]  *See* Martin Beck et al., *Mechanism of Femoroacetabular Impingement*, in FEMOROACETABULAR IMPINGEMENT 9, 12 (Óliver Marín-Peña ed., 2012) (noting "coxa profunda" is a type of deep socket hip abnormality that causes pincer impingement from overcoverage of the hip and can lead to osteoarthritis.)

femur.  AR 738.  He was prescribed anti-inflammatory and muscle relaxant medication as well as a pain reliever.  *Id.*

Carter returned to see his Dr. Van Hofwegen in April 2009.  Dr. Van Hofwegen noted that Carter walked with a minimal right hip lurch, but retained full range of motion of his right knee and ankle.  AR 753.  Radiographs showed minimal degenerative changes in the right hip and Carter was diagnosed with "[m]oderately symptomatic right hip osteoarthritis with overlying pain."  *Id.*  Dr. Van Hofwegen suggested that he see the pain clinic or the physiatrist again, otherwise come back for a follow-up in a couple of years.  *Id.*

Carter visited the emergency room at Mercy Medical Center in December 2009 for right hip pain.  AR 755-69.  He was prescribed a pain reliever and advised to follow up with a family physician or the orthopaedic specialist at UIHC to manage his pain.  AR 763.

In March 2010, UIHC advised Carter that recent tests indicated he had early diabetes and that he should make certain changes to his diet.  AR 770-73.

### B. State Agency Medical Consultants

As part of previous disability applications, state agency medical consultants performed physical residual functional capacity ("RFC") assessments in August 2005, July 2006, August 2006 (on review), and January 2007 (on reconsideration).  Physical RFC assessments for Carter's current application were performed in March 2008 and June 2008 (on reconsideration).  Upon reconsideration of his RFC in December 2006, Carter also alleged a mental impairment of depression.  A consultative examination was scheduled and a psychiatric review technique was performed in January 2007.

The first physical RFC assessment in August 2005 concluded Carter could occasionally lift or carry 20 pounds and could frequently lift or carry 10 pounds.  He could also sit and/or stand about six hours in an eight-hour workday.  AR 454.  These conclusions were based on an x-ray from May 2004, the examination performed by Dr.

Martin in July 2005, and Carter's self-reported activities of daily living including stretching, cooking, cleaning, laundry, watching TV, shopping, and visiting with others. AR 241-48, 455. The examiner gave more weight to the objective evidence in the file than Carter's subjective complaints because "[t]he credibility of his allegations [was] further reduced due to lack of treatment for his condition." AR 455.

On July 18, 2006, another physical RFC assessment was performed by Dr. James Wilson. AR 524-25. Dr. Wilson concluded that Carter could occasionally lift or carry 50 pounds and frequently lift or carry 25 pounds. He also thought that Carter could sit and/or stand for six hours in an eight-hour workday. *Id.* Dr. Wilson's assessment was based on a physical examination and a review of the objective medical evidence. During his physical examination Dr. Wilson found four out of five positive Waddell signs[2] with no indication of muscle spasms or nerve damage/muscle wasting. Dr. Wilson also found that although Carter reported symptoms 24 hours a day and seven days a week with frequent muscle spasms, the objective physical findings failed to support the severity or even presence of those symptoms. AR 528. In addition, Dr. Wilson noted the failure to seek ongoing treatment was not consistent with the extreme functional limitations alleged by Carter. *Id.* Any inconsistencies with examining sources were attributed to the lack of objective findings and the erosion of Carter's credibility at the time of the examination. AR 529. This assessment was reviewed by

---

[2] Waddell signs are an examination technique used for patients with low back pain. The technique involves five different tests that are useful in determining whether the patient's response to the physical test is consistent with the signs and symptoms of low back pain or can be attributed to a psychological influence. A positive sign suggests that the response is psychological and three or more of the five types is clinically significant. *See* Gordon Waddell et al., *Nonorganic Physical Signs in Low-Back Pain*, 5 SPINE 117 (1980). Dr. Wilson performed the Waddell signs technique and noted:

> Claimant self limited on ROM testing, which was considered invalid by the examining source. SLR testing was inconsistent with seat vs. supine positions. Claimant also complained of low back pain on axial impression and w/ simulated rotation. Claimant's report of numbness in the lower extremities were in a nonanatomical pattern, further eroding claimant's credibility. Claimant was able to heel-toe walk and perform tandem gait without apparent difficulty. AR 524-25.

Dr. Herbert Waxman in August 2006, who affirmed Dr. Wilson's conclusions.  AR 538-39.

Philip Laughlin, Ph.D., performed a psychiatric review technique in January 2007 after reviewing Dr. Baker's report, function reports from Carter and a third party, and medical records from treating sources.  AR 554-67.  Dr. Laughlin found Carter had no severe mental impairments but confirmed adjustment disorder with depressed mood as diagnosed by Dr. Baker.  AR 557.  He concluded Carter had mild functional limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace with no episodes of decompensation.  AR 564.

Dr. John May was asked to reconsider Carter's physical RFC in January 2007. AR 546-53.  The only new medical evidence at that time was from Carter's visit to the emergency room at Mercy Medical Center in July 2006.  AR 547.  Dr. May concluded that there was no change to Carter's physical RFC as determined by Dr. Wilson in July 2006.  AR 547-48.

Dr. May completed another physical RFC assessment in March 2008.  At this time Carter's primary diagnosis was possible lumbar degenerative disc disease and sacroilitis.  AR 671.  The record contained treatment notes from UIHC up to February 11, 2008.  AR 680.  Dr. May concluded Carter could occasionally lift or carry 20 pounds, could frequently lift or carry 10 pounds, and could stand and/or sit six hours in an eight-hour workday.  AR 672.  Dr. May noted there was little objective medical evidence to support Carter's complaints of back pain until August 2007 when Carter had an MRI, which revealed some disc degeneration without evidence of neural involvement.  AR 678.  Dr. May also referenced the negative EMG, physical examination results and Carter's sacroiliac joint injections.  He reviewed Carter's most recent function report noting that Carter reported pain but was able to tend to his personal needs, cook, do laundry, clean the house, shop, walk half a block, and socialize.  He also noted that Carter used a cane but it had not been ordered by a treating source and Carter could ambulate without it.  Finally, he recognized that Carter

was never considered a surgical candidate and no treating sources had indicated physical limitations be placed on Carter due to his pain. Dr. May concluded that it would be reasonable to assume that while Carter's back pain would cause some limitation based on his previous treatment, he was capable of the RFC outlined. *Id.* Dr. May's RFC assessment was submitted for reconsideration by Dr. Everett Nitzke in June 2008. Dr. Nitzke affirmed the assessment as written. AR 683.

## C. Plaintiff's Testimony

At the administrative hearing, Carter testified that his past jobs included heavy labor jobs and factory work where he would lift at least 150 pounds on his own. AR 36-37. Carter said he initially injured his back in 1995 but did not realize the extent of his injury until he started seeing doctors in 2004. AR 37. He indicated that doctors now thought that spurs on his right hip might be causing him pain. *Id.* Carter said the doctors told him he was too young for hip replacement and his hip spurs could not be shaven down. AR 38. He described his pain as sharp and achy. *Id.*

Carter stated doctors in Iowa City advised him to walk with a cane or a crutch and he has been using a crutch at all times for the past six months because of the pain in his legs. *Id.* He testified he is limited to sitting on his left side because he cannot put pressure on his right hip. He explained that after five or ten minutes he has to shift further to his left side or lay down. *Id.* Standing also causes him pain. He is able to lift 10 to 30 pounds, but only for a short time. AR 40, 42. Carrying anything would be difficult because of his need to use a crutch. AR 42.

As for his daily activities, Carter said he spends most of his day lying down and that he reads or watches movies. AR 41. He said he tries to go shopping, but after walking around for five to ten minutes, he has to sit down. *Id.* He stated he was currently taking Tramadol (a pain reliever), but it did not give him any relief. AR 41, 43.

### D. Wanda Abraham's Testimony

Carter's girlfriend and roommate, Wanda Abraham, was also present at the administrative hearing.   AR 45.   Ms. Abraham works as a cashier and has known Carter for seven years.   *Id.*   Ms. Abraham testified that Carter has trouble getting out of bed in the morning and cannot walk or stand for more than ten minutes.   AR 46. She stated he can sit up for only five or ten minutes before he has to lie down on his left side.   *Id.*   She explained that on a bad day Carter's activity level is "basically none" and he sleeps, reads, or watches television all day while lying down.   *Id.*   She said he can clean dishes but to do so he must sit in a chair leaning on his left side.   *Id.* She further elaborated that he does not sleep well and when he is lying down during the day he constantly has to re-shift his position.   AR 46-47.

### E. Vocational Expert Testimony

A vocational expert also testified at the hearing.   He stated Carter would not be able to perform his past work based on the alleged limitations and an assumption that Carter's testimony was credible because it indicated he spent most of his waking hours lying down.   AR 49.   The ALJ then gave the VE a hypothetical question asking if a person of Carter's same age, with the same education and transferrable skills who was able to work at a light level with a sit-stand option that entailed no climbing, repetitive bending, twisting or turning, crawling, squatting, kneeling, or balancing would be able to find such a job in the national or regional economy.   AR 50.   The VE indicated that jobs as a production assembler and hand packager fit this description and significant numbers for these jobs were available in the four-state region of Iowa, Nebraska, Missouri, and Kansas and in the national economy.   AR 51.

The ALJ also asked if jobs were available for a sedentary worker with the same limitations and including a sit-stand option.   *Id.*   The VE identified jobs as a hand packager, unskilled office helper, and production assembler were available for a sedentary worker.   *Id.*   The ALJ then asked if work would be available for someone

who had to recline and rest frequently due to inability to relieve chronic pain, fatigue, or medication side-effects and who was unable to sustain the concentration, persistence, and pace on a continuing routine basis to complete the required tasks of an eight-hour workday. AR 51-52. The VE indicated that no jobs would be available for someone with these limitations. AR 52. When asked by Carter's attorney if the jobs of a production assembler or hand packager could be performed by someone who needed the aid of a crutch, the VE answered those jobs could not be performed with a crutch because the crutch would totally occupy the use of a hand. AR 52.

### Summary of ALJ's Decision

The ALJ made the following findings:

(1) The claimant met the insured status requirements of the Social Security Act through June 30, 2010.
(2) The claimant has not engaged in substantial gainful activity since April 28, 2004, the alleged onset date.
(3) The claimant has the following severe impairments: degenerative disc disease of the lumbar spine and degenerative joint disease of the right hip.
(4) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.
(5) After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary to light work as defined in 20 C.F.R. 404.1567(a), 404.1567(b), 416.967(a), and 416.967(b) except he needs a sit/stand option and is precluded from climbing stairs or ladders; repetitive bending, twisting, or turning; crawling, stooping, squatting, kneeling, or balancing.
(6) The claimant is unable to perform any past relevant work.
(7) The claimant was born on March 15, 1964 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.
(8) The claimant has at least a high school education and is able to communicate in English.
(9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework

supports a finding that the claimant is "not disabled," whether or not the
claimant has transferable job skills.

(10) Considering the claimant's age, education, work experience, and
residual functional capacity, there are jobs that exist in significant
numbers in the national economy that claimant can perform.

(11) The claimant has not been under a disability, as defined in the Social
Security Act, from April 28, 2004 through the date of this decision.

AR 11-18.

In assessing Carter's credibility, the ALJ noted that while he did not doubt that

Carter experienced some discomfort, his allegation of limitations and pain level that

would preclude all types of work was inconsistent with the objective medical evidence,

the absence of more aggressive treatment, medical opinions, and the evidence as a

whole.  AR 16.  He further elaborated:

> The record reflects the claimant sought minimal medical treatment and
> failed to take his treating medications on a regular basis.  None of the
> claimant's treating sources assessed significant functional limitations
> beyond the above residual functional capacity assessment or recommended
> he limit his activities, seek further treatment or surgery, use a cane, or lie
> down and rest to the degree alleged.  Furthermore, the objective medical
> evidence fails to support the claimant's allegation of disability.

AR 16.   The ALJ also found Carter's daily functioning had not been affected as

severely as alleged.  He noted that when Carter applied for disability he was still

working part-time as a laborer, and in February 2008, Carter reported having no

problems with personal care, preparing meals, washing dishes, doing housework and

laundry, going shopping, and playing cards, dominoes, or darts.  AR 16-17.   In

January 2010, Carter also stated he would occasionally clean dishes, do laundry, cook,

read, go grocery shopping, and attend church.  AR 17.

The ALJ also considered testimony and a third party function report from

Carter's girlfriend, Wanda Abraham, who lives with Carter.  AR 14.  At the hearing

Ms. Abraham testified that Carter lies down the entire day, constantly shifts positions,

and can only sit, stand, and walk about five to ten minutes before needing to change his

position.   *Id.*   In a third party function report completed in November 2006, Ms. Abraham reported that Carter was able to go shopping, prepare meals, and enjoy hobbies such as watching television and cooking without any change since his medical condition began.   *Id.*   In that report, she listed no problems with Carter's ability to perform personal care or household chores.   *Id.*   The ALJ did not give great weight to Ms. Abraham's testimony because he found it inconsistent with the record as a whole.

The ALJ gave great weight to the physical RFC assessments performed by the state agency medical consultants finding that their conclusions were consistent with the record as a whole, both at the time of their review and through the date of the decision. AR 14.   The ALJ also gave substantial weight to the opinions of Dr. Buck and Dr. Martin because they were supported by the evidence and consistent with the record as a whole.   They were also generally consistent with the state agency medical consultants' assessments that Carter would be able to perform light work.   The ALJ also considered treatment notes from the various emergency rooms Carter reported to and from Siouxland Community Health Center and UIHC where Carter saw specialists for his back and hip.   AR 15-16.

*Disability Determinations and the Burden of Proof*

A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions;

16

(4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-

medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### *The Substantial Evidence Standard*

The court will affirm the Commissioner's decision "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit explains the standard as "something less than the weight of

the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Wester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir.

1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## Discussion

### A. Carter's Credibility

Carter argues the ALJ failed to consider his subjective complaints of pain and inability to function due to his back and hip impairments and erred in finding that Carter's subjective complaints were not entirely credible.  He specifically argues that his subjective complaints were consistent with the medical records and the ALJ erred by failing to provide reasons for discrediting the testimony and to set forth the inconsistencies found.   The Commissioner responds by stating the ALJ properly considered and listed inconsistencies between Carter's subjective allegations and the objective medical evidence to support his credibility determination.

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Baldwin*, 349 F.3d at 558 (citing *Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir. 1987)).   The court will therefore defer to the ALJ's credibility determinations so long as they are supported "by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).   An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole.   *Id.*   To evaluate a claimant's credibility, the ALJ uses the test laid out in *Polaski v. Heckler* which requires the ALJ to consider:

> (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) any functional restrictions.

*Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).   "Other relevant factors include the claimant's relevant work history, and the absence of objective medical

evidence to support the complaints." *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008) (quoting *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). An ALJ is not required to "discuss methodically each *Polaski* consideration, so long as he acknowledged and examined those considerations before discounting the [claimant]'s subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000). If an ALJ discounts a claimant's subjective complaints, he or she is required to "detail the reasons for discrediting the testimony and set forth the inconsistencies found." *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004)).

The ALJ acknowledged the *Polaski* test before discounting Carter's subjective complaints. AR 14. The ALJ also provided reasons for discrediting Carter's testimony and identified the inconsistencies in the record using the *Polaski* factors. Beginning with the first factor of the claimant's daily activities, the ALJ concluded that Carter's daily functioning was not as limited as he claimed. AR 16. "Pain may be discredited by evidence of daily activities inconsistent with such allegations." *Davis v. Apfel*, 239 F.3d 962, 967 (8th Cir. 2001). "[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain." *Medhaug v. Astrue*, 578 F.3d 805, 816 (8th Cir. 2009).

The ALJ noted that in February 2008 Carter reported no problems with personal care, preparing meals, washing dishes, doing housework and laundry, going shopping, and enjoying hobbies. AR 16-17, 390-95. Carter's function report from February 2008 alleges some discomfort with these activities, but he indicated that he would do these activities on a regular basis for an hour at a time. AR 390-95. The ALJ also referenced Carter's answers to interrogatories in January 2010, where he reported that he would occasionally wash dishes, do laundry, cook, read, shop for groceries, and attend church. AR 17, 435-42. While the Eighth Circuit has held "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work," *Reed v.*

*Barnhart*, 399 F.3d 917, 923-24 (8th Cir. 2005), the ALJ also noted that Carter was working part-time as a laborer at the time of his current application. AR 16, 344. The record shows Carter held two other part-time jobs as a laborer since his alleged onset date in 2004. AR 344. Although this work activity did not rise to the level of substantial gainful activity, it is relevant in determining credibility. *See Medhaug*, 587 F.3d at 816 (holding the ALJ properly considered the claimant's employment positions maintained after the alleged onset date in helping determine the claimant's credibility).

During the administrative hearing, Carter alleged much more severe limitations to his daily functioning than was supported by objective medical evidence. "[A]n ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them." *Goff*, 421 F.3d at 792 (quoting *O'Donnell v. Barnhart*, 318 F.3d 811, 816 (8th Cir. 2003)). "The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints." *Polaski*, 739 F.2d at 1322. "Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Id*. During the hearing, Carter claimed he spent most of his day sitting or lying down and was only able to sustain activities such as walking for five to ten minutes. AR 40-41. The ALJ referenced Carter's treatment notes which included no recommendations that he limit his activities or lie down and rest to the extent Carter claimed was necessary. AR 16. Because the inconsistencies concerning Carter's daily activities were not based solely on the lack of objective medical evidence, but also on Carter's own self-reported activities and work as a laborer while allegedly disabled with back pain, the ALJ properly considered Carter's activities of daily living in evaluating the credibility of his subjective complaints.

The ALJ also evaluated the duration, intensity, and frequency of pain, along with the treatment Carter was receiving to help determine the credibility of his subjective complaints. The ALJ noted that Carter sought minimal medical treatment for

his condition and he failed to take his treating medications on a regular basis.  AR 16.
The ALJ also pointed out that the objective medical evidence failed to support his
allegations of disabling pain since his treating sources did not recommend further
treatment, surgery, or use of a cane, and they did not assess significant functional
limitations beyond the limitations identified in the RFC assessment.  AR 16.

The ALJ properly considered Carter's credibility based on the evidence in the
record concerning the extent of his pain and his treatment.  "A claimant's allegations of
disabling pain may be discredited by evidence that the claimant has received minimal
medical treatment and/or has taken only occasional pain medications."  *Wagner v.
Astrue*, 499 F.3d 842, 851 (8th Cir. 2007).  "A failure to follow a recommended
course of treatment also weighs against a claimant's credibility."  *Guilliams*, 393 F.3d
at 802.  Carter often sought medical treatment, but it was not the recommended course
of treatment.  The majority of Carter's treatment consisted of intermittent emergency
room visits, where he would complain of back and hip pain.  He was prescribed
various pain relievers, anti-inflammatory medication, and muscle relaxants throughout
these visits.  Although Carter was consistently advised to seek follow-up treatment with
a primary care provider to manage his pain, Carter failed to do so until January 2007.
AR 537, 613, 624, 763.

Carter claims his failure to seek regular treatment was due to lack of funds, but
physicians often directed him to Siouxland Community Health Center, which provides
healthcare to low-income individuals.  *See Murphy v. Sullivan*, 953 F.2d 383, 386-87
(8th Cir. 1992) (finding claimant's failure to seek low-cost medical treatment or present
evidence that claimant had been denied medical care because of her financial condition
was enough for the ALJ to determine that the claimant's financial hardship was not
severe enough to justify her failure to seek treatment).  Carter eventually sought
treatment at Siouxland Community Health Center in January 2007, which lasted four
months before he was referred to Dr. Yang, an orthopaedic specialist at UIHC through

the IowaCare program which provides some health care coverage to people who otherwise have no coverage.

Treatment at UIHC provided some objective evidence of the cause of Carter's pain but the treatment he received does not support Carter's allegations of disabling pain or significant functional limitations.   Dr. Yang initially found evidence of degenerative disc disease from an MRI scan, but concluded the MRI results were of "uncertain clinical importance" after an EMG showed no evidence of lumbosacral radiculopathy.   AR 653, 659.   Dr. Yang suggested that Carter's physical examinations were indicative of a sacroiliac joint pain generator, which is predominantly inflammatory.   AR 654.   Carter was prescribed anti-inflammatory medication and also had sacroiliac joint injections.   *Id.*   Carter tried various treatment options suggested by Dr. Yang, but claimed none of them permanently resolved his pain.   Carter was not considered a good candidate for surgery.

Carter continued to report to emergency rooms between appointments with Dr. Yang.   In May 2008, Dr. Yang suggested the problem was in his hip and found that Carter's spine was fine.   AR 703.   An x-ray of his hip revealed coxa profunda with moderate degenerative changes of the hip.   AR 712.   Dr. Van Hofwegen saw Carter for his hip and concluded that Carter had mild hip arthritis with symptoms that seemed to be worse than the radiographs revealed.   AR 748.   Carter was not considered a good candidate for total hip replacement.   Dr. Van Hofwegen prescribed anti-inflammatories and recommended "being aggressive about being active."   AR 748.   At a follow-up four months later, Dr. Van Hofwegen noted the radiographs showed minimal degenerative changes in the right hip, referred Carter to the pain clinic, and scheduled a follow-up a couple years later.   AR 753.   At the time of the hearing, Carter was taking Tramadol, a pain reliever, but claimed it did not provide him any relief.

The ALJ also considered the examinations and assessments by state agency medical consultants, who provided opinions on Carter's functional capacities despite the pain he was reporting.   "As is true in many disability cases, there is no doubt that the

claimant is experiencing pain; the real issue is how severe that pain is." *Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir. 1991). "Pain is recognized as disabling when it is not remediable and precludes a claimant from engaging in any form of substantial gainful activity." *Cruse v. Bowen*, 867 F.2d 1183, 1186 (8th Cir. 1989) (citing *Benson v. Matthews*, 554 F.2d 860, 863 (8th Cir. 1977)). In March 2008, Dr. May found the medical evidence failed to substantiate Carter's low back pain until August 2007, and concluded that even though it would be reasonable to assume his back pain would cause some limitation, the evidence demonstrated Carter could still perform light work. AR 678. This assessment was affirmed upon reconsideration of the evidence in June 2008, by Dr. Nitzke, another state agency medical consultant. The ALJ also noted the previous examinations in 2005 and 2006 by Dr. Buck and Dr. Martin were consistent with the state agency medical consultants' assessments for light work and were supported by evidence and consistent with the record as a whole.

After reviewing all the evidence concerning the duration, intensity, and frequency of pain, along with the treatment Carter received to determine the credibility of his subjective allegations, the ALJ concluded:

> While the undersigned does not doubt that the claimant experiences some discomfort, the allegations of limitations and a pain level that precludes all types of work are inconsistent with the objective medical evidence, the absence of more aggressive treatment, medical opinions, the evidence as a whole, and thus, the allegations are not fully credible.

AR 16. As demonstrated above, this reasoning is supported by substantial evidence in the record as a whole. In addition, the ALJ found Carter could only perform light or sedentary work, with a sit-stand option, indicating he took into account some of Carter's subjective complaints that were supported by the record.

The ALJ thoroughly outlined the inconsistencies in the record as a whole and gave legitimate reasons for discrediting the claimant's subjective complaints. These reasons are supported by substantial evidence, and thus, the court will not disturb the ALJ's credibility determination.

### B. Weighing of Medical Evidence

Carter also argues the ALJ erred in weighing the medical opinions to determine his RFC.  First, he argues the ALJ erred by failing to describe the weight given to the state agency medical consultants.  Second, he argues the ALJ should not have given significant weight to the opinions of the state agency medical consultants because their reports did not consider treatment notes from UIHC.  Finally, he argues the opinions of treating sources at UIHC must be given controlling weight.  The Commissioner responds that the ALJ properly relied on the opinions of the state agency medical consultants because he did not rely solely on these opinions but conducted an independent review of the medical evidence and found the subsequent treatment notes and opinions were consistent with the consultants' findings and did not contradict the RFC assessment.  The Commissioner also argues that none of the treating source opinions contradict the ALJ's RFC finding.

"In deciding whether a claimant is disabled, the ALJ considers medical opinions along with 'the rest of the relevant evidence' in the record." *Wagner*, 499 F.3d at 848 (quoting 20 C.F.R. §§ 404.1527(b), 416.927(b)).  "Medical opinions" are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. §§404.1527(a)(2), 416.927(a)(2).  Other relevant evidence includes medical records, observations of treating physicians and others, and an individual's own description of his limitations.  *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).  "Some medical evidence 'must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'"  *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  "Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions

of a state agency medical . . . consultant." 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).

Carter argues the ALJ erred by not explaining the weight given to the state agency medical consultants' opinions. However, the ALJ expressly stated he gave "great weight" to the assessments completed by the state agency medical consultants. AR 14. He reasoned "they are acceptable medical sources and their conclusions are consistent with the record as a whole, both at the time of their review and through the date of this decision." *Id.* The ALJ also gave "substantial weight" to the opinions of Dr. Buck and Dr. Martin, who briefly examined Carter in 2005 and 2006. He reasoned these opinions were generally consistent with the assessments of the state agency medical consultants and the record as a whole. AR 15. As for Dr. Bertram, who briefly treated Carter in 2004 and found that he had unrestricted work duty and no permanent partial disability, the ALJ assigned "some weight" to this opinion because later evidence supported limitations of light or sedentary work. AR 15.

The specialists at UIHC offered no opinions on Carter's physical limitations or the work activity Carter could still perform despite his impairment. AR 16. However, the ALJ considered the treatment notes and nothing suggests he discredited any of the findings contained therein. The ALJ properly explained the weight given to the non-treating and treating sources as required by the regulations.

The ALJ was also entitled to assign significant weight to the opinions from the state agency medical consultants despite the fact that they did not review all of the medical records from UIHC. When evaluating a non-examining source's opinion, the ALJ "evaluate[s] the degree to which these opinions consider all of the pertinent evidence in [the] claim, including opinions of treating and other examining sources." 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). The weight given to their opinions "depend[s] on the degree to which they provide supporting explanations for their opinions." *Id.* While opinions of non-examining sources do not constitute substantial evidence, *see Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003), an ALJ does not

commit reversible error when he or she undertakes an independent review of the medical evidence and does not rely solely on the opinion of a non-examining source in determining a claimant's RFC. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002) (citing *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)).

The state agency medical consultants completed evaluations in 2005, 2006, 2007, and 2008. The physical RFC assessment for the current disability application was completed by Dr. May in March 2008 and was affirmed upon reconsideration by Dr. Nitzke in June 2008. Dr. May concluded Carter could occasionally lift or carry 20 pounds, could frequently lift or carry 10 pounds, and could stand and/or sit six hours in an eight-hour workday. AR 672. Dr. May's assessment was based on medical records from Carter's emergency room visits up to February 11, 2008, treatment notes from Siouxland Community Health Center and UIHC up to February 11, 2008, as well as function reports and other documents Carter submitted with his disability application. AR 671-82. In explaining his RFC assessment, Dr. May referenced the MRI and EMG results from UIHC as well as results from physical examinations, Carter's activities of daily living, and the treatment he was receiving for his back pain. AR 678. He stated that while it was reasonable to assume that Carter's pain would cause some limitations, he thought Carter was capable of the RFC suggested. *Id.*

The fact that Dr. May did not have access to all of the records from UIHC does not prevent the ALJ from assigning significant weight to his assessment if the ALJ conducted an independent review of the evidence, which included treatment notes the consultant had not considered. Dr. May reviewed records from UIHC dating from 2003 to February 11, 2008 for his RFC assessment. Carter began treatment at UIHC in May 2007. Dr. May adjusted his previous RFC assessment based on these records by decreasing the limits that Carter could be expected to lift or carry and citing test results from UIHC. AR 671, 678.

The state agency medical consultants did not review treatment records relating to Carter's hip because that was not part of his diagnosis until August 2008. AR 745.

Carter's hip problem was deemed to be another possible explanation for his persistent pain, not a new or additional impairment.  AR 703.  The ALJ reviewed the subsequent treatment notes from UIHC concerning Carter's hip.  AR 16.  He summarized the treatment notes which contained a diagnosis of mild hip arthritis with symptoms that seemed to be worse than the radiographs revealed.  AR 16, 748.  Those treatment notes also indicated that Carter was not a good candidate for total hip replacement and the physician recommended a course of anti-inflammatories and "being aggressive about being active."  *Id*.  The ALJ concluded that the state agency medical consultants' assessments were "consistent with the record as a whole, both at the time of their review and through the date of this decision," indicating that he considered them in light of the subsequent treatment notes from UIHC.  AR 14.  The ALJ did not err in assigning significant weight to the consultants' opinions because those opinions were not the sole basis for his RFC determination and his independent review of the evidence revealed that the assessments were further substantiated by subsequent treatment notes from UIHC and the record as a whole.

Finally, Carter contends the ALJ should have given controlling weight to treating source opinions.  Medical opinions from treating physicians are entitled to substantial weight.  *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).  If the ALJ finds that a treating physician's opinion on the nature and severity of the claimant's impairment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] record, [the ALJ] will give it controlling weight."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  "When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so."  *Brown v. Astrue*, 611 F.3d 941, 951-52 (8th Cir. 2010).

Carter does not identify which treating opinions were not given substantial weight that should have been given such weight.  The Commissioner correctly identifies that the only medical opinions from treating sources were Dr. Bertram's

opinion in 2004 that Carter had unrestricted work duty and Dr. Buck's opinion that Carter could lift 10 to 20 pounds and perform limited bending and twisting.  The ALJ gave Dr. Bertram's opinion "some weight" and provided sufficient reasoning to discredit this opinion because it was inconsistent with later evidence that revealed Carter was limited to performing only light or sedentary work.  The ALJ gave Dr. Buck's opinion "substantial weight" and reasoned that his opinion was consistent with the record as a whole.  Carter's only other treating sources were Dr. Yang and Dr. Van Hofwegen at UIHC who did not provide any opinions on Carter's ability to function in the workplace and did not indicate any functional limitations in their treatment notes. Nothing in the record suggests the ALJ gave the UIHC specialists' findings anything other than controlling weight and their treatment notes are consistent with the RFC determination.   Thus, the ALJ gave proper weight to the treating source opinions and treatment notes in the record.

The ALJ properly weighed the medical evidence in the record.  He assigned appropriate weight to the state agency medical consultants' assessments and conducted an independent review of the medical evidence to determine whether it supported an RFC determination of light or sedentary work.  The ALJ also gave appropriate weight and consideration to the evidence from treating sources.  Therefore, the ALJ did not err in weighing the medical evidence.

### C. Hypothetical Question to VE

Carter argues that because the ALJ erred in discrediting the claimant's testimony and did not properly weigh the medical opinions, the ALJ's hypothetical question to the VE was also improper because it did not include all of Carter's limitations.  Carter specifically argues that the hypothetical question should have addressed Carter's need to use a cane.  The Commissioner argues that the ALJ's hypothetical question was proper because it only had to include the claimant's credible limitations, which did not include Carter's use of a cane because that limitation was not established by the record as a whole.

"A vocational expert's testimony constitutes substantial evidence when it is based on a hypothetical that accounts for all of the claimant's proven impairments." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010).  The hypothetical question must include "those impairments that the ALJ finds are substantially supported by the record as a whole." *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996).  "[A]n ALJ may omit alleged impairments from a hypothetical question posed to a vocational expert when '[t]here is no medical evidence that those conditions impose any restrictions on [the claimant's] functional capabilities.'" *Owen v. Astrue*, 551 F.3d 792, 801-02 (8th Cir. 2008) (quoting *Haynes v. Shalala*, 26 F.3d 812, 815 (8th Cir. 1994)).

Here, the limitations included in the hypothetical question to the VE were light level or sedentary work with a sit-stand option that entailed no climbing, repetitive bending, twisting or turning, crawling, squatting, kneeling, or balancing.  AR 50-51.  The VE identified jobs as a hand packager, production assembler, and unskilled office helper were available with these limitations.  *Id.*  During the administrative hearing, Carter's attorney asked the VE whether any of these jobs could be performed if the individual had to use a cane to support himself.  AR 52.  The VE responded that none of the identified jobs would be available because the cane would totally occupy the use of one of his hands.  *Id.*

The ALJ's hypothetical question to the VE was proper because it included the limitations the ALJ found credible and supported by the record as a whole. As discussed above, the ALJ's credibility determination and weighing of the medical evidence is supported by substantial evidence and therefore the ALJ did not err by including only those credible limitations in the hypothetical question posed to the VE. The ALJ also found that Carter's need to use a cane was not supported by the record. He noted that the cane was not prescribed and treatment notes indicated that he could ambulate without it. AR 14, 705, 745. Because the ALJ provided good reasons for discrediting this limitation that are supported by substantial evidence in the record, the ALJ was not required to include the use of a cane in the limitations for the hypothetical question. Therefore, the ALJ's hypothetical question to the VE was proper and the VE's testimony constitutes substantial evidence.

### *Conclusion*

After a thorough review of the entire record and in accordance with the standard of review this court must follow, the court concludes that the ALJ's determination that Carter was not disabled within the meaning of the Act is supported by substantial evidence in the record. Accordingly, the decision of the ALJ must be **affirmed**. Judgment will be entered in favor of the Commissioner and against Carter.

**IT IS SO ORDERED.**

**DATED** this 20th day of August, 2012.

_____
LEONARD T. STRAND
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT